IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **JAMES BROWN** | * | **CIVIL ACTION NO. 09-00743** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **WARDEN,** **LOUISIANA STATE PENITENTIARY** | * | **MAGISTRATE JUDGE** **KAREN L. HAYES** |

REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed on November 26, 2007, by petitioner James Brown ("Brown"). Doc. # 1. Brown is an inmate in the custody of the Louisiana Department of Public Safety and Corrections. He is incarcerated at the Louisiana State Penitentiary in Angola where he is serving a life sentence. This matter was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the court. For reasons assigned below, it is recommended that the petition (doc. # 1) be **DENIED**.

BACKGROUND

**I. Introduction**

James Brown and Ronnie Walker were close friends, co-workers at the Applegate Insulation factory, and residents of Monroe's Fontana Alley, a dirt road lined by shotgun houses. On many nights, the residents of Fontana Alley, including Brown and Walker, would gather on a neighbor's porch to drink and play cards, dominoes, and dice.

On the evening of June 27, 2004, Brown was socializing on a neighbor's porch when Walker confronted him. Walker wanted to know whether a rumor that Brown was having an

affair with his wife, Verna Walker, was true.  An altercation between the two men ensued, and Brown ultimately shot Walker once.  Walker died from the gunshot wound.

On September 1, 2005, a jury in the Fourth Judicial District for Ouachita Parish found Brown guilty as charged for second degree murder.  On November 28, 2005, Brown was sentenced to a term of life imprisonment.  The Second Circuit of the Louisiana Court of Appeal subsequently affirmed Brown's conviction.  *State of Louisiana v. Brown*, 940 So. 2d 100 (La. Ct. App. 2006).

After exhausting his state court remedies, Brown filed the instant petition, arguing, in essence, four claims for relief: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; (3) insufficiency of the evidence; and (4) defective jury instructions.  On April 20, 2010, this court held an evidentiary hearing specifically regarding, but not limited to, the first two claims.  Docs. # 13, 28.  In these claims, Brown alleged that his trial attorneys, Louis Scott and Robert C. Johnson, rendered ineffective assistance in failing to call Walker's wife as an eyewitness and that the state engaged in prosecutorial misconduct when it prevented Mrs. Walker from testifying at trial.

In his post-hearing memorandum, Brown withdrew his prosecutorial misconduct claim.  Doc. # 30 at 4.

The parties' briefs focused extensively on the transcripts of the trial and the evidentiary hearing.  Accordingly, before turning to the merits of Brown's remaining claims, this court will consider the testimony set forth at both the trial and the evidentiary hearing.

**II. Trial**

To support its theory for second degree murder, the state relied on the testimony of

several witnesses, but only one eyewitness, Milton Pittman. Pittman testified that he visited friends at Fontana Alley on the evening of June 27, 2004. R. at 452. He was sitting in the back of his truck when he witnessed Mr. Walker pull Brown from a porch and throw him to the ground. *Id.* at 454-55. As the two men were "swinging" and "fighting," Mr. Walker accused Brown of having an affair with his wife, and Brown denied the accusations. *Id.* at 454. Eventually the two men stopped fighting and walked toward a fence where they had a conversation, although Pittman could not hear what they said to each other. *Id.* The two men then walked back to the area where they had their fight. *Id.* at 455. There, Brown turned around, pulled out a pistol, and shot Mr. Walker. *Id.* at 456. At the moment that Brown shot Mr. Walker, Brown was not bleeding, and Mr. Walker did not have a weapon in his hands and was not hitting Brown *Id.* at 456-57. Pittman testified that Brown walked to his house after he shot Mr. Walker. *Id.* at 457.

Brown presented a different version of the events. Testifying on his own behalf, he attempted to demonstrate that he was acting in self-defense when he shot Mr. Walker. On the evening of June 27, 2004, he was playing cards on a neighbor's porch with Mr. Walker's wife and a few other residents of Fontana Alley when, "from out of nowhere," Mr. Walker grabbed him, pulled him off the porch, and accused him of having an affair with his wife. *Id.* at 510, 517. Mr. Walker then got on top of Brown, and proceeded to choke Brown with his right hand and beat Brown with his left. *Id.* at 518. Meanwhile, Brown denied that he was having an affair with Mrs. Walker. *Id.* Mrs. Walker eventually succeeded in breaking up the fight between the two men. *Id.* at 519. However, before Brown could walk away, Mr. Walker said, "[i]t ain't over," and began to choke and beat Brown again. *Id.* Brown felt Mr. Walker's grip on his throat get

3

increasingly tighter, even as he tried to release himself. *Id.* at 520. Brown testified that he shot Mr. Walker because he felt that was the only way he could release himself from Mr. Walker's grasp. *Id.* at 521-22. Brown also testified that he did not intend to kill Mr. Walker. *Id.* at 521.

### III. Evidentiary Hearing

Brown's trial attorneys, Louis Scott and Robert C. Johnson, did not call any eyewitnesses to corroborate Brown's testimony. Accordingly, at the evidentiary hearing, Brown called Mrs. Walker in an effort to demonstrate that she would have testified in his favor had Scott and Johnson called her at his trial.

On direct examination, Mrs. Walker testified that two or three days prior to June 27, 2004, she had moved out of the house that she shared with her husband and into her mother's house. Doc. # 28 at 19. However, Mrs. Walker believed that the move was only temporary and that she would eventually reconcile with her husband. *Id.* at 27.

Mrs. Walker further testified that she arrived at Fontana Alley in the afternoon of June 27, 2004. *Id.* at 5. Brown was already there playing dominoes with a group of people, none of whom was Mr. Walker. *Id.* at 6. Mrs. Walker learned from the group that Brown had boasted earlier that day of having sexual relations with her and several other women who lived on Fontana Alley. *Id.* When she confronted Brown about this rumor, he denied having started it. *Id.* Mrs. Walker then walked away from Brown because she did not want to make her husband jealous. *Id.* at 7. Mrs. Walker testified that her husband had an "explosive" temper. *Id.*

Mr. Walker subsequently arrived at Fontana Alley. *Id.* at 7-8. Mrs. Walker testified that she could tell that her husband was "agitated and angry." *Id.* at 8. Mrs. Walker tried to get her husband to calm down and asked him if he wanted to leave. *Id.* at 9. Mrs. Walker testified that

she knew that Mr. Walker was going to confront Brown.  *Id.*

Mr. Walker subsequently walked up to Brown, grabbed him by the collar, threw him to the ground, and proceeded to hit him in the chest and bump his head against the ground.  *Id.* at 10-11.  Mr. Walker was approximately two inches taller and thirty pounds heavier than Brown.  *Id.* at 10.  Brown did not hit Mr. Walker back and told Mr. Walker that he was not having an affair with his wife.  *Id.* at 11.  During the fight, Mrs. Walker screamed at her husband to stop.  *Id.*  After approximately ten to fifteen minutes, Mr. Walker stopped attacking Brown and walked away.  *Id.* at 12.

Brown and Mr. Walker eventually walked toward a nearby fence.  *Id.* at 13.  Mrs. Walker also walked toward the fence because she wanted to help her husband calm down.  *Id.* at 14.  Mrs. Walker testified that the two men apologized to each other at this time.  *Id.*

Mrs. Walker then tried to get her husband to leave because "even though everything seemed to be okay, [she] could still tell that he was upset."  *Id.*  Mrs. Walker grabbed her husband by the arm and tried to walk away with him.  *Id.* at 15.  However, Mr. Walker stopped, pushed his wife aside, and said, "[t]his s--- ain't over."  *Id.*  Mr. Walker turned toward Brown.  *Id.*  Brown said, "[y]eah, it's over."  *Id.*  Mrs. Walker testified that she did not see a gun, but heard a pop.  *Id.*  She then saw her husband fall to the ground.  *Id.*

Mrs. Walker testified that when her husband turned around and said, "[t]his s--- ain't over," he was "just a few steps" from Brown and that Brown "was just standing there."  *Id.* at 15, 27.  Mrs. Walker also testified that Brown would have known when Mr. Walker turned around that Mr. Walker "wouldn't have stopped" if a second fight occurred, and that Brown would have needed to fight back in a second fight.  *Id.* at 16.

5

On cross examination, the state emphasized a recorded statement that Mrs. Walker gave to the Monroe Police Department immediately after the shooting. Regarding the events immediately leading up to the shooting, Mrs. Walker averred:

> [Mr. Walker] got angry again. He went and sat his beer back on the porch and that's when he turned around and he told James he say this ain't over man. And [Brown] say let me show you how much it ain't over and walked up to him and shot him.

Man. Ex. 1. at 4; doc. # 28 at 32. In addition, Mrs. Walker testified that immediately before the shooting, Mr. Walker was not choking or hitting Brown. Doc. # 28 at 38.

## LAW AND ANALYSIS

### I. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA) of 1966, 28 U.S.C. § 2254, governs habeas corpus relief. The standard of review is set forth in 28 U.S.C. § 2254(d):

> (d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000). "The

'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal *habeas* courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e).

**II. Petitioner's Claims**

    **A. Ineffective Assistance of Counsel**

        **1. Standard**

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254. *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). To prevail on a claim of ineffective assistance of counsel, a defendant must show both (1) that his counsel's actions fell below an objective standard of reasonableness and (2) that the ineffectiveness of counsel prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). If the defendant does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997). The prongs of the test also need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).

To prove deficient performance, the defendant must demonstrate that counsel's actions "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687. There is a strong presumption that counsel performed adequately and exercised reasonable professional

7

judgment. *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006). Furthermore, "a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.*

To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" and is less than a preponderance of the evidence. *Id.* at 693-94.

Regarding ineffective assistance of counsel claims based on counsel's failure to call a witness, the Fifth Circuit Court of Appeals "has repeatedly held" that such claims "are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Thus, to prove that counsel's failure to call a witness was prejudicial, a petitioner must demonstrate (i) that the witness was available to testify and would have done so; (ii) that the testimony would have been favorable to a particular defense; and (iii) a reasonable probability that the uncalled witness would have made a difference to the result of the trial. *Bray v. Quarterman*, 265 Fed. Appx. 296, 298 (5th Cir. 2008).

### 2. Deficient Performance

The state contends that defense counsel made a strategic decision not to call Mrs. Walker. The state specifically contends that defense counsel sent an investigator to interview Mrs. Walker after the shooting, and that the notes from this interview, as well as Mrs. Walker's statement to

the police, reasonably led defense counsel to believe that Mrs. Walker would have contradicted the self-defense theory that Brown was planning to set forth at trial with his own testimony. Doc. # 31 at 6.

In order for Brown to demonstrate that defense counsel's decision not to call Mrs. Walker amounted to deficient performance, he must overcome the "strong presumption" that this decision "falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[1] *See Murray v. Maggio*, 736 F.2d 279, 281-82 (5th Cir. 1984). Brown has not made this showing.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 694. At the time that defense counsel made the decision not to call Mrs. Walker, they had access to the statement that Mrs. Walker gave to the police as well as the notes from their investigator's interview with Mrs. Walker. While the parties provided the court only with a copy of Mrs. Walker's police statement, the state contends that the investigator's interview notes were consistent with Mrs. Walker's police statement, and Brown does not specifically dispute this contention. *See* Doc. # 31 at 6.

In her police statement, Mrs. Walker specifically averred, as previously noted, that after her husband said "this ain't over," Brown said, "let me show you how much it ain't over" and

---

[1] This presumption particularly applies in this matter because neither the state nor the petitioner called either of Brown's attorneys to testify at the hearing. *See Talley v. Cain*, No. 08-3542, 2008 U.S. Dist. LEXIS 111687, at *29 (E.D. La. Dec. 9, 2008).

then "walked up to [Mr. Walker] and shot him." Man. Ex. 1. at 4. This specific passage in Mrs. Walker's police statement does not support a theory of self-defense because it suggests that Brown responded to Mr. Walker's verbal threat with deadly and therefore excessive force. *See* LA. REV. STAT. ANN. § 14:20(A)(2) ("A homicide is justifiable . . . [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."). This passage in Mrs. Walker's police statement also suggests that Brown was the aggressor because he initiated the physical contact between the two men by "walking up" to Mr. Walker. *See* LA. REV. STAT. ANN. § 14:21 ("A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.").

Mrs. Walker's police statement also contains the following exchange between her and Detective Arthur Graves of the Monroe Police Department:

> Det. Graves: Does [Brown] got a hot temper or something?
> Mrs. Walker: You know usually he's a little hot headed but my husband is the most hot headed. He's the quickest to want to fight. He's the quickest to confront you.
> Det. Graves: So . . .
> Mrs. Walker: [Brown] is usually the kind more laid back . . . that's why it's so surprising.
> Det. Graves: So when your husband said this ain't over man?
> Mrs. Walker: It was to fight again . . . he was ready to fight again.
> Det. Graves: So he was basically fixing to come up to him and fight again?
> Mrs. Walker: Yeh . . . yes.

Man. Ex. 1 at 7. At the evidentiary hearing, Brown's habeas counsel appeared to contend that this specific passage in Mrs. Walker's police statement would support Brown's self-defense

theory. Doc. # 28 at 26. However, nothing in this passage indicates that Mrs. Walker believed that Brown would have been in danger of losing his life or receiving great bodily harm if a second fight occurred. *See* LA. REV. STAT. ANN. § 14:20(A)(2). For example, Mrs. Walker did not aver that her husband would have fought especially violently or used a weapon if a second fight had occurred. In this passage, Mrs. Walker simply averred that her husband intended to "fight again" when he said "this ain't over . . . ." Man. Ex. 1 at 7. In light of the relatively minor injuries that Brown suffered from the first fight, the undersigned cannot find that this particular averment by Mrs. Walker signified that she believed that Brown was in danger of receiving great bodily harm or worse when her husband said "this ain't over."

The witnesses that defense counsel calls at trial are necessarily dependent upon the theory of defense pursued at trial. *See Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004). Defense counsel's opening and closing arguments at trial indicate that their theory of defense was that Brown killed Mr. Walker in self-defense. Defense counsel's pretrial investigation of Mrs. Walker, which included reviewing her police statement and sending an investigator to interview her, revealed that she would not support such a theory. Accordingly, defense counsel's decision not to call Mrs. Walker to testify was sufficiently reasonable so as not to amount to deficient performance under *Strickland*.

Brown argues that defense counsel's decision not to call Mrs. Walker was unreasonable because her police statement was consistent with her testimony at the evidentiary hearing in that both contradicted the theory presented by the state at trial that Brown committed second degree murder. *See* Doc. # 32 at 3. Brown's argument is unavailing because, as the foregoing discussion indicates, Mrs. Walker's police statement was, at the very least, not inconsistent with

11

a theory that Brown committed second degree murder. Furthermore, Mrs. Walker's testimony at the evidentiary hearing is irrelevant to this court's analysis of defense counsel's performance under *Strickland*'s first prong. This court's task under *Strickland*'s first prong is "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 694. Thus, what is relevant to this court's analysis is the information that defense counsel had gathered about Mrs. Walker at the time they decided not to call her, namely her police statement and the notes their investigator had collected from his interview with her. As previously noted, both of these sources of information reasonably led defense counsel to believe that she would not support the self-defense theory that they pursued at trial.

In light of this court's finding that defense counsel were not deficient, the court need not consider whether defense counsel's conduct prejudiced Brown under *Strickland*'s second prong. *Tucker v. Johnson*, 115 F.3d at 281 (stating that if the defendant does not make a sufficient showing as to one prong of the test, the other prong need not be considered).

**B. Insufficiency of the Evidence**

Brown also argues that the evidence that the state introduced at trial was insufficient to support a conviction of second degree murder. In Louisiana, second degree murder is "the killing of a human being" when, *inter alia*, "the offender has a specific intent to kill or to inflict great bodily harm." LA. REV. STAT. ANN. § 14:30.1.

When a habeas petitioner asserts that the evidence presented to the court was insufficient to support his conviction, the limited question before a federal habeas court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the

clearly established federal law set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

The Louisiana Second Circuit invoked and applied the *Jackson* standard to the facts of this case. *State of Louisiana v. Brown*, 940 So. 2d at 102-05. The court concluded that the evidence presented at trial was sufficient to establish that Brown committed second degree murder. In reaching this conclusion, the court noted that the jury was obligated to make a crucial credibility determination between Brown and the only eyewitness that the state called at trial, Milton Pittman. *Id.* at 105. Whereas Pittman testified that Mr. Walker was not hitting Brown and did not have a weapon in his hands when Brown shot him, Brown testified that he shot Mr. Walker to release himself from Mr. Walker's stranglehold. R. at 456-57, 521-22. The Louisiana Second Circuit declined to disturb the jury's verdict, which implicitly credited Pittman's testimony over Brown's. *State of Louisiana v. Brown*, 940 So. 2d at 105.

The Louisiana Second Circuit did not unreasonably apply the *Jackson* standard. A rational jury could have certainly credited Pittman's testimony over Brown's and therefore found

13

that Brown committed second degree murder. Accordingly, no relief is warranted on Brown's insufficiency of the evidence claim.

### C. Jury Instructions

With his final claim, Brown contends that the trial court failed to instruct the jury about how they should consider the "lack of evidence," in violation of LA. CODE CRIM. PROC. ANN. art. 804(A)(2). This statute provides that the court is obligated in all cases to charge the jury that "[i]t is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case."

The record from Brown's case reflects that the court charged the jury with an instruction that is nearly identical to the instruction outlined in LA. CODE CRIM. PROC. ANN. art. 804(A)(2). R. at 93. Accordingly, no relief is warranted on this claim.

### CONCLUSION

For the reasons stated above, it is recommended that the petitioner's petition for writ of habeas corpus (doc. #1) under 28 U.S.C. § 2254 be **DENIED and DISMISSED with prejudice**. Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, August 25, 2010.

*[signature]*
KAREN L. HAYES
U. S. MAGISTRATE JUDGE